# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### PECOS DIVISION

**FILED**

SEP 2 6 2005

CLERK, U.S. DISTRICT COURT
Western DISTRICT OF TEXAS
by_____
DEPUTY CLERK

**AVINASH RANGRA,**
**ANNA MONCLOVA, &**
**All Other Public Officials in Texas,**
    **Plaintiffs**

**V.**

**FRANK D. BROWN,**
    **83D JUDICIAL DISTRICT ATTORNEY,**
**GREG ABBOTT,**
    **TEXAS ATTORNEY GENERAL, and**
**THE STATE OF TEXAS**
    **Defendants**

**CAUSE NO.**

P 05CV ᴥ75

## BRIEF IN SUPPORT OF
## PLAINTIFF'S ORIGINAL COMPLAINT

To the Court:

    The Texas Open Meetings Act was enacted as a "sunshine law", to permit the public to participate in discussions and decision making of public officials. Everyone can agree with this concept in principle. No one wants decisions of public officials to be made in a smoke filled room, where deals are cut far from public view. TOMA, however, has been transmogrified into an all encompassing act that now denies public officials the same First Amendment freedoms enjoyed by their fellow citizens.

## I.
## INTRODUCTION

    Plaintiffs seek declaratory judgment that the Texas Open Meetings Act (TOMA), Tex. Gov't Code Ann. § 551.001 *et seq.*, is both overbroad and unconstitutionally vague, and therefore cannot be enforced against them. The violation of the Act in question occurred on or about October 21, 2004, when Katie Elms- Lawrence, then a member of

**Plaintiffs' Brief in Support of Declaratory Judgment-1**

the Alpine City Council, sent an email to three other council members—Avinash Rangra,

Anna Monclova, and Manuel Payne.[1]  The following day, Avinash Rangra responded to

Lawrence's email.[2]  Thereafter, Rangra and Elms- Lawrence were indicted for violating

the Texas Open Meetings Act,[3] while the other two members were given testimonial

immunity.  Although the indictments were later dismissed, they were dismissed *without*

*prejudice*, leaving Rangra and Lawrence still subject to prosecution. Monclova and Payne

are subject to prosecution, so long as their grand jury testimony is not used as the basis

for the prosecution. All plaintiffs are subject to future criminal prosecution, should they

exercise their first amendment rights, by discussing public issues, other than at a public

meeting.

TOMA was originally enacted in 1967, but has been amended numerous times.

The most significant amendments occurred in 1987 and 1999, particularly in changing

the definitions of the term "meeting," which is the core focus of the Act.

---

[1] "Avinash, Manuel..Anna just called and we are both in agreement we need a special meeting at 6:00pm Monday...so you or I need to call the mayor to schedule it( mainly you, she doesn't like me right now I'm Keri's MOM) ..we both feel Mr Tom Brown was the most impressive..no need for interviewing another engineer at this time...have him prepare the postphonment of the 4.8 million, get us his firms review and implementation for the CURE for South Alpine...borrow the money locally and get it fixed NOW....then if they show good faith and do the job allow them to sell us their bill of goods for water corrections for the entire city......at a later date..and use the 0 % amounts to repay the locally borrowed money and fix the parts that don't meet TECQ standards.... We don't have to marry them...with a life long contract, let's just get engaged!  Let us hear from you both KT"

[2] "Hello Katie.....I just talked with  John Voller of Hibb and Todds of Abilene... and invited him to come to the Monday meeting.  I asked him to bring his money man also.... these guys work for Sul Ross... He said... he will be at meeting Monday....I'll talk with Tom Brown also after my 8:00 class ..Thanks for the advice..... and I'll talk with Mickey as per your, Anna, and Manuel  directions... and arrange the meeting on Monday....We must reach some sort of decision  SOOOOOOOOOOOOOON. Avinash Katie.... please correct my first name spellings...Thanks."

[3] Specifically, Rangra and Lawrence were charged with "knowingly participat[ing] in a closed meeting of a quorum of a governmental body, to wit, the City Council of Alpine Texas, of which the defendant was a member and said meeting was not permitted under the Open Meetings Act[.]"

**Plaintiffs' Brief in Support of Declaratory Judgment-2**

This brief is written to illustrate both standing and the overbreadth of TOMA as applied to government officials like the Alpine City Council members, and applied as well to a vast array of government officials that could be subject to the Act for similar conduct; the brief also addresses the vagueness of the Act which allows prosecutors excess discretion in deciding who to prosecute.

## II.
### STANDING

#### A. *Overview*

Avinash Rangra has standing in this declaratory judgment action because, as a current member of the Alpine City Council, he is under a present and future threat of prosecution. Notably, Rangra could still be prosecuted for his past acts, (the dismissal of his indictment being without prejudice), as well as for future acts of continuing to answer his telephone, open his mail, talk to voters, and read and write his email. Others in Rangra's position also face a similar threat of prosecution.

Anna Monclova has standing because she faced a credible threat of past prosecution, avoiding it only through a grant of testimonial immunity. She could be re-indicted for the same acts, so long as her grand jury testimony was not used as a basis for prosecution. If she receives or sends emails in the future, opens her mail, answers her telephone, or talks to voters, other than at a City council meeting, she faces a credible threat of prosecution.

#### B. *Declaratory Judgment Standard*

"In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a) (2000).

### C. Summary of Arguments

Declaratory judgment is proper here because an actual controversy exists. Although the indictment of Avinash Rangra has been dismissed, this was done without prejudice, leaving a threat of future prosecution. Further, Anna Monclova, Manuel Payne, and others like them throughout the state of Texas face an implied threat of prosecution under the Texas Open Meetings Act.[4]

Declaratory judgment was proper to stay enforcement of a Florida criminal law prohibiting a grand jury witness from revealing grand jury testimony, because such ban violates the First Amendment. *Butterworth v Smith, 494 U.S. 624 (1990).* See *Mills v Alabama, 384 U.S. 214, 218 (1966):* "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of government affairs." See *Landmark Communications Inc. v Virginia, 435 U.S. 829 (1978)*(Virginia law struck down permitting criminal punishment of persons who publish truthful information about proceedings of judicial conduct commission).

### D. Arguments & Authorities

#### 1. Test for Actual Controversy

The test for an actual controversy is whether there is "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Such controversy cannot be imaginary or speculative.

---

[4] Katie Elms Lawrence is no longer a member of the Alpine City Council.

**Plaintiffs' Brief in Support of Declaratory Judgment-4**

*See Younger v. Harris*, 401 U.S. 37, 42 (1971).  The existence of an actual controversy may be demonstrated by an ongoing threat of prosecution.  *See, e.g., Houston v. Hill*, 482 U.S. 451 (1987); *Steffel v. Thompson*, 415 U.S. 452 (1974); *Younger v. Harris*, 401 U.S. 37 (1971); *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979).

## 2.  Defining Threat of Prosecution

The United States Supreme Court has held that when an individual alleges an intention to engage in conduct which is constitutionally protected, yet proscribed by state law, and there is a realistic threat of prosecution under that state law, an individual "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), *quoting Doe v. Bolton*, 410 U.S. 179 (1973).  Whether a threat of prosecution adequately satisfies the actual controversy requirement in a given case is a "factual and case-specific" question. *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997).

In the instant case, the indictments were dismissed without prejudice, so no member of the Alpine City Council was actually convicted.  However, such prosecution to conviction is not required.  Because the indictments were dismissed without prejudice, and because the council members regularly use email as a means of communication, there remains a realistic threat of future prosecution, either for the October 21-22, 2004 emails, for future emails, or for engaging in other communication with each other and their constituents.

When it is clear that provisions apply to a specific class of individuals, "the imminent threat of such prosecutions can be deemed speculative only if it is likely that

the government may simply decline to enforce these provisions at all." *Id.* at 1000. In *Navegar, Inc. v. United States*, the court found that the Violent Crime Control and Law Enforcement Act of 1994 targeted firearms manufacturers, by making it illegal to "manufacture, transfer, or possess a semiautomatic assault weapon." *Id.* at 997, 1000. The "threat of prosecution" gave firearms manufacturers standing to bring a preenforcement challenge to the constitutionality of the act.

The Texas Open Meetings Act is clearly meant to be applied to public officials, and those who communicate with them. These public officials, plaintiffs herein, have a legitimate fear of the "threat of prosecution" for allegedly violating the criminal provisions of TOMA, merely by exercising their first amendment right of free expression. Thus, the threat of prosecution under the Texas Open Meetings Act is only speculative if it is unlikely that the government would seek to enforce the Act. However, Avinash Rangra and Katie Elms Lawrence were previously indicted under the Act, demonstrating the government's willingness to enforce the Act.

### 3.  Examples of Actual Controversies

In *Younger v. Harris*, the Supreme Court held that one plaintiff had standing because he had actually been indicted under the state statute in question. 401 U.S. at 42. However, the other plaintiffs in the suit lacked standing because they failed to allege that they would be prosecuted for conduct which they planned to engage in. *Id.* The Court noted that "if the District Court had found [such an] allegation to be true . . . then a genuine controversy might be said to exist." *Id.*

In *Houston v. Hill*, the plaintiff was arrested four times under a city ordinance, which made it illegal to interrupt a police officer in his duties. 482 U.S. at 453. The

Supreme Court, invalidating the ordinance as overbroad, held that the plaintiff had shown a "genuine threat of enforcement" of the ordinance against his future activities. *Id.* at 459 n.7, *quoting Steffel,* 415 U.S. at 475.

There are other circumstances and cases where the courts have found an actual controversy existed even though there was no present or past prosecution. *See, e.g., Steffel v. Thompson,* 415 U.S. 452 (1974); *Dombrowski v. Pfister,* 380 U.S. 479 (1965). In *Steffel,* the plaintiff was never arrested for violating the law in question; he was, however, warned twice to discontinue his action or he would be prosecuted. *See* 415 U.S. at 459. In *Dombrowski,* no charges or proceedings had been initiated against the plaintiff when the declaratory action was filed. 380 U.S. at 482.

### *E. Standing Summary*

Avinash Rangra was previously indicted for violating the Texas Open Meetings Act. His indictment was dismissed without prejudice, leaving behind a credible threat of future prosecution. This threat of prosecution "may deter . . . almost as potently as the actual application of sanctions." *N.A.A.C.P. v. Button,* 371 U.S. 415 (1963). He is chilled in the future exercise of his first amendment rights, through the legitimate fear of future prosecutions should he do so.

Anna Monclova could be indicted for the emails, if her grand jury testimony is not used. She legitimately fears future prosecutions should she communicate other than in a council meeting.

Rangra and Monclova have standing to bring this declaratory judgment and constitutional challenge.

**Plaintiffs' Brief in Support of Declaratory Judgment-7**

## III.
## IMPORTANCE & HISTORY OF FIRST AMENDMENT RIGHTS

Our Founding Fathers envisioned a representative form of government that would take the place of citizens meeting in person. The Federalist, No, 52, p. 338 (Scigliano ed. 2000). The electors were to be the "great body of the people of the United States," and the elected were to be anyone who their "fellow-citizens may confer the representative trust." Id., No. 57, p. 366. The opportunity to serve as an elected official was "open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession or religious faith." Id., No. 52, p. 337. The ideal government would be where one regular citizen represents many other regular citizens.

This idea is repeated throughout the Federalist Papers when Madison refers to elected officials as "fellow-citizens." Id., Nos. 52, 57, 62. Madison rejected the idea that electors and the elected would be treated by different standards. While referring to the House he stated: "...[T]hey can make no law which will not have its full operation on themselves [the House of Representatives] and their friends, as well as on the great mass of society. This has always been deemed one of the strongest bonds by which human policy can connect the rulers and the people together. It creates between them that communion of interests and sympathy of sentiments, of which few governments have furnished examples; but without which every government degenerates into tyranny." Id. No. 57, p. 367. Not only were all laws to apply equally to both elected and elector, but protection of rights extended equally as well. "... [T]he Framers of the first amendment intended also that its protection should extend not to some limited groups but to all citizens." *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 180 (1971) (BLACK, J., dissenting).

In *New York Times Co. v Sullivan, 376 U.S. 254 (1964),* Justice Brennan, writing for the majority, stated:

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v United States, 354 U.S. 476* ...Mr. Justice Brandeis, in his concurring opinion in *Whitney v California, 274 U.S. 357, 375-76,* gave the principle its classic formulation:
>
> > "Those who won our independence believed... that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they know that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope, and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; **that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies**; and that the fitting remedy for evil counsels is good ones. **Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form.** Recognizing the occasional tyrannies of governing majorities, **they amended the Constitution so that free speech and assembly should be guaranteed.**

*New York Times Co. v Sullivan, 376 U.S. at 268 (emphasis added).*

The First Amendment does not apply unequally to different classes. An elected or appointed official, (as well as his constituents), does not forfeit his first amendment freedoms as a prerequisite to taking office. TOMA, however, does this, singling out public officials for actual or threatened prosecution, for merely discussing public issues, or receiving correspondence or email—the protected exercise of first amendment rights.

In 1966 a unanimous United States Supreme Court upheld the idea that elected officials have the same free speech rights as the ordinary citizen. *Bond v. Floyd*, 385 U.S. 116 (1966). In *Bond,* a Georgia man had been elected to the Georgia House of Representatives but had been excluded by other members of the House based on his statements opposing the Vietnam War. The Court concluded that such a measure was a violation of Bond's free speech. *Id.* In the case

**Plaintiffs' Brief in Support of Declaratory Judgment-9**

the state attempted to argue that while "a citizen might be protected by his First Amendment rights, the State may nonetheless apply a stricter standard to its legislators." *Id.* at 133. The Court explicitly rejected such an idea. *Id.* The court reasoned that while a state may require something of its elected officials not required of its remaining citizens, such as an oath, this power does not extend to limiting the legislators' capacity to discuss views. *Id.* at 135.

The Supreme Court's decision that elected officials have the same free speech rights as regular citizens was guided by the proposition that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). The Court went on to support the idea that elected officials and electors have equal rights and protections under the law: "The State argues that the New York Times principle should not be extended to statements by a legislator because the policy of encouraging free debate about governmental operations only applies to the citizen critic of his government. We find no support for this distinction in the New York Times case or in any other decision of this Court. The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than the legislator." *Bond*, at 136.

Since 1966, *Bond* has been cited positively by a number of different courts: "The Court rejected a differing first amendment standard for publicly-elected officials." *Miller v. Town of Hull, Massachusetts*, 878 F.2d 523, at 532-33 (1st Cir. 1989). "The Supreme Court specifically rejected the argument that elected officials have lesser first amendment rights than ordinary citizens." *Id.*, at 534. "The Court in *Bond* stated in dicta that if the statements in question had been made by a private citizen, they would have been protected by the first amendment." *Vacca v. Barletta*, 753 F.Supp. 400, at 405 (D. Mass, 1990). "*Bond* squarely holds that legislators

enjoy the same degree of first amendment protection as private citizens." *Gewertz v. Jackson,* 467 F. Supp. 1047, at 1058 (D.C.N.J., 1979).

Our Founding Fathers created a government to be made up of ordinary citizens. The idea that elected officials and voters were to be held to different standards was a concept foreign to them. It is clear in their writings and Supreme Court rulings that this idea remains true today. It is not a crime for ordinary citizens to email each other about pressing public issues. TOMA makes it a crime for city council members to do the same thing. The First Amendment applies to all. Elected or appointed officials have the same First Amendment rights as their fellow citizens, but TOMA impermissibly singles out a certain class of persons, and certain speech, and bans it.

## IV.
## OVERBREADTH, VAGUENESS, & EXCESS DISCRETION

### A. *The Texas Open Meetings Act (TOMA) is Substantially Overbroad and Works to Suppress the Protected Speech of Government Officials*

"Overbroad statutes may be facially attacked because their very existence may discourage persons from engaging in protected expression out of fear of prosecution under the law." *Broadrick v. Oklahoma,* 413 U.S. at 612 (1973). The United States Supreme Court ruled in the *Broadrick* decision that when First Amendment freedoms are threatened by an Act, the Act must be tailored in such a way that still allows for protected speech and does not run the risk of suppressing speech with the threat of possible criminal sanctions. *Id.* TOMA is an act which some claim to be a time, place, and manner restriction on the speech of government officials; however, "facial overbreadth claims have also been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct." *Id* at 613.

It is important to note that when an act is overbroad *any* enforcement of that act is unconstitutional "until or unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Id.* When a law imposes criminal penalties on speech, like TOMA, suppression of speech will naturally occur. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2001). The *Ashcroft* court noted that even *minor* punishments can chill protected speech. *Id.*

    1.  <u>TOMA Creates an Impermissible Risk of Suppressing Ideas</u>

        *a.  There is No Limiting Construction of TOMA from Case Law*

A federal court reviewing a constitutional challenge to a state statute should not impose a limiting construction contrary to state interpretation or practice. *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975). Limiting constructions should be found either in the state courts or in the state's Attorney General opinions, which act as persuasive but not binding authority on the courts.

An analysis of the reasoning used by the Austin court of appeals shows that the TOMA rests on suppressing the speech of elected officials by claiming it is a time, place and manner restriction. *Hays County Water Planning Partnership v. Hays County, Texas*, 41 S.W.3d 174 (Tex. App.—Austin 2001). In that case, a county commissioner gave a presentation on matters of public importance during a meeting. The case dealt with whether notice to the public was adequate. Because the court found the notice inadequate since the substance of the speech was not revealed beforehand, the court ruled that a closed meeting had taken place. "The problem with Molenaar's [the defendant's] remarks is not that he could not make them at all, but rather the location and timing of his comments." *Id.* This case illustrates the fact that attempted compliance to hold an open

meeting and make the community aware that the commissioner was going to speak was not enough, and this precedent makes it difficult for a government official to know what notice is adequate and when they can make a statement about matters upon which they were elected. *See id.*

In *Acker v. Texas Water Commission*, the Supreme Court of Texas held that if a majority of a public decision making body is considering a pending issue, there can be *no* informal discussion. 790 S.W.2d 299 (Tex. 1990). In that case, two members of a committee discussed a permit request while in a restroom, and the court found that a possible violation of TOMA had occurred. *Id.* Thus, any board or government committee of only three members could likely have no association one with another without possibly raising a factual issue of whether they had violated TOMA. *Id.* at n. 3. In *Cox Enterprises*, the court realizes that "the Act does not prohibit members in executive session from expressing their opinions on an issue and expressing how they expect to vote…a contrary holding would debilitate the role of the deliberations…and would unreasonably limit the rights of expression and advocacy;" however, when a straw poll was taken at an executive session, members were found to have violated the Act when in essence all they had done was announce who they intended to vote for in the actual open meeting. *Board of Trustees v. Cox Enterprises, Inc.*, 679 S.W.2d 86 (Tex. App.—Texarkana 1984), *affirmed in part, rev'd in part* by 706 S.W.2d 956 (Tex. 1986). Although the court attempted to limit the Act to require the physical presence of members to constitute a quorum for a meeting, this construction may no longer be valid given the 1999 Amendments to the Act. *Id.*

**Plaintiffs' Brief in Support of Declaratory Judgment-13**

Two attempts have been made by Texas courts of appeal to limit the TOMA definition of what constitutes "verbal exchange" and when a "quorum" exists.  The first, in 1993, limited verbal exchange to "a reciprocal giving and receiving of spoken words." *Dallas Morning News v. Board of Trustees*, 861 S.W.2d 532 (Tex. App.—Dallas 1993). However, this limitation has been overturned by the amendments to the Act in 1999.  The second case addressed a phone conversation between two members of the board and held that a quorum did not exist; however, they based their reasoning not on requiring physical presence to have a meeting, but that *three* members were needed to have a meeting, thus leaving open the possibility that physical presence is NOT required in order to have a meeting.  *Harris County Emergency v. Harris County Emergency,* 999 S.W.2d 163 (Tex. App.—Houston [14th Dist.] 1999).

### b. The 1999 Amendments to TOMA Broadened the Scope of the Law Even More, and Erased What Little Limitation Had Been Created

Prior to 1999, § 551.001 of TOMA defined meeting as: "a deliberation between a quorum of a governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the governmental body has supervision or control is discussed or considered or during which the governmental body takes formal action." In 1999, however, a new definition of meeting was added, making mere expressions by government officials a violation of the Act and thereby eliminating the attempts by courts to limit the scope.  Now, a meeting can also include, "a gathering … at which the members receive information from, give information to, ask questions of, or receive questions from any third person, including an employee of the governmental body, about the public business or public policy over which the governmental body has supervision or control." §551.001(B)(iv).

<u>**Plaintiffs' Brief in Support of Declaratory Judgment-14**</u>

This means that deliberation between the members is no longer required, so verbal exchange is no longer required to have a meeting that violates TOMA. Thus, a meeting now can violate TOMA if any third party attends an open meeting and asks a question or makes a statement about board matters. This is evident by the language used in *Gardner v. Herring*, when the court noted that "*under the pre-1999 Act*, a meeting occurred when there was a 'giving and receiving of spoken words' about a matter of public business." 21 S.W.3d 767, 771 (Tex. App.—Amarillo 2000)(emphasis added). That court noted the change in the Act in a footnote, that meeting now includes a new definition, but that the alteration "lacked retroactive effect," conceding that a different outcome would be possible under the new definition. *Id.* In *Willmann v. City of San Antonio*, the court noted that "a governmental body does not always insulate itself from TOMA's application simply because less than a quorum of the parent body is present." 123 S.W.3d 469, 478 (Tex. App.—San Antonio 2003).

### c. The Texas Attorney General Opinions Show the Breadth of Protected Speech that is Being Suppressed

In 1992, the Attorney General addressed whether the circulation of a letter among city council members, which they sign, could constitute a violation of TOMA. The opinion found that if a quorum of the members had signed the letter and the letter contained public business, then it was a violation. The AG noted the Act's "requirements are not necessarily avoided by avoiding the physical gather of a quorum in one place at one time." Atty Gen. Op. DM-95 (1992).

An opinion written soon after the 1999 Amendments illustrates the expanding nature of the Act as well as the Legislature's attempt to minimize the effect of court decisions limiting the definitions of verbal exchange and deliberation. In 2000, the AG

**Plaintiffs' Brief in Support of Declaratory Judgment-15**

specifically noted again that "the Act has been construed to apply to situations in which members of a governmental body act as a body but are not in each other's physical presence." Atty Gen. Op. JC-307 (2000). In fact, the AG states that avoiding the technical definition of "meeting" or "deliberation" will not protect one from the Act, meaning that the definition of "meeting" is not a reliable indicator of all the situations which could be construed to constitute a "meeting" or a "deliberation." *Id.*

In that same opinion, the AG also eliminates the verbal exchange construction given by the courts of appeal, concluding that *Gardner* and *Dallas Morning News*, where members merely listened but did not respond to a verbal presentation, did not distinguish between *written* and spoken exchange. *Id.* The AG opinion seems to say that "deliberation" could include written communication and electronic mail. *Id.*

Another AG opinion makes clear that the new definition of meeting eradicates the need for any form of deliberation between the members at all. Atty Gen. Op. JC-0313 (2000), holding a committee "subject to [TOMA]...*regardless of whether the committee members or any Board members engage in a deliberation as defined by [the Act.]*" *Id.* (emphasis added). This means that the purpose of TOMA, which is to prevent government officials from conspiring in secret about public business, is totally ignored because no two members actually have to communicate with each other to violate the Act (which is true after the 1987 Amendments, but even more likely a scenario now).

      d.    *TOMA now criminalizes giving and receiving information by numbers less than a quorum*

Attorney General opinion GA-0326 (2005), notes that TOMA does not require

that governmental body members be in each other's physical presence to constitute a quorum. It noted that telephone calls among members of a government body violates TOMA, even if no decision is reached in such calls.

## 2. *TOMA is Substantially Overbroad*

Overbreadth occurs when a statute covers many types of speech that should not be subject to state restriction because they are protected by the First Amendment. Overbreadth challenges to laws are allowed to prevent chilled speech. Overbreadth challenges are appropriate in cases where there is a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court. *New York State Club Association, Inc. v. City of New York*, 487 U.S. 1 (1988).

Here, it is easy to see how TOMA could be applied to numerous situations where the speech of individuals is protected by the First Amendment. Public officials also have a right to free expression and speech under the First Amendment. In the case before the court, the only way to create a quorum of the city council is to claim four members of the council were involved in this "meeting" of sending emails. First, that would mean that the two council members who merely received emails were engaging in a deliberation. Second, merely receiving email, receiving regular mail, or answering a telephone could subject a person to criminal penalties. Third, sending out an agenda to a quorum of a governmental body could constitute a violation. Even receiving regular mail or reading a newspaper announcement read by other council members could be a violation. No one

can determine exactly what they may receive in the form of emails or correspondence, but TOMA now criminalizes the mere receipt of such information.

Now, anyone serving their community on government boards would risk criminal liability. Not only will this Act chill speech, but also it will discourage the participation in local government committees and councils.

### B. *TOMA is Unconstitutionally Vague and Allows for Excess Discretion*

Vague laws may do three types of damage: first, they may trap the innocent by not providing fair warning; second, they can impermissibly allow policemen, judges, prosecutors, and juries to decide basic policy matters; third, especially true where the First Amendment is involved, vagueness can inhibit the exercise of constitutional freedoms. *Grayned v. City of Rockford*, 408 U.S. 104 (1972). In the area of the First Amendment, the Supreme Court has found that precision of regulation must be even more important. *United States v. Robel*, 389 U.S. 258 (1967). The key principle in determining if a statute is void for vagueness is whether the law affords fair warning of what is proscribed. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).

### 1. TOMA Provides No Fair Warning of What Speech is Prohibited

Very recently, the Texas Legislature has considered amendments to TOMA, and has passed a new bill in response to concerns, Senate Bill 286 (2005). The bill was passed directly in response to complaints that even after having read the Act, most people could not understand what was allowed and what was not. Senate Bill 286 now mandates training for a one hour course for elected officials subject to the Act. *Id.* However, the Act is not limited to elected officials, and there is no penalty for not going to the training.

**Plaintiffs' Brief in Support of Declaratory Judgment-18**

Private citizens can be prosecuted for communicating with public officials. *Id.*  Texas legislator Toby Goodman proposed amending the Act to make it clearer—that merely receiving information would not be a crime. After polling was done, the result showed many people still unable to decipher what the Act requires. Rep. Goodman's amendment did not pass, making it clear, once again, that the Texas legislature wants to criminalize the acts of communicating, or receiving information, in addition to criminalizing the act of making a secret decision.

In 1999 when Amendments changing the definition of "meeting" were passed, other legislators attempted to clarify the definitions of quorum, so that individuals corresponding and communicating would not be such a risk to government officials. Many people were still confused.  *"Bill Would Close Door on Official Meetings" by* Stephen Scheibal; American-Stateman (2005).

The Attorney general has said that even assembling in an informal setting, such as a social occasion, could subject members to the Act if there is any exchange about public business or policy among a quorum.  Atty Gen. Op. H-785 (1976).  Public business is not limited to immediate public matters. Two members of a board talking about President Bush, at a football game, facially violates the act. Even non-spoken communications can lead to violations of the Act, such as receiving email or regular mail. It is a violation of TOMA if three Jeff Davis County commissioners attend a Ft. Davis High School football game at the same time, and have any kind of discussion about "public business".

Merely listening to the public could subject public officials to the Act even if the elected officials do not participate in the discussions.  Atty Gen. Op. JC-0169 (2000) at 3-4.  Who is subject to the Act is also expanding.  *Id.* An argument can be made that, if a

**Plaintiffs' Brief in Support of Declaratory Judgment-19**

quorum of the Alpine City council all hear the same interview on KVLF radio, a violation has occurred.

### 2.  TOMA Fails to Establish Minimal Guidelines for Enforcement

Government officials who participate in closed meetings may be found guilty of violating the Act and subject to criminal sanctions even if they did not know that the meeting was prohibited; there is no statutory good faith exception. *Tovar v. State*, 978 S.W.2d 584 (Tex. Crim. App. 1998).

TOMA leaves so many possibilities for what could constitute a violation that local prosecutors and judges have vast discretion to decide what is and what is not a violation. Federal courts should not impose a limiting construction contrary to state interpretation or practice, which here is only to broaden the scope of the law and make nearly any communication by a government official potentially subject to the Act. *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975).

A limiting instruction is too difficult to create. The statute should be struck down, and enforcement thereof prohibited, until the Texas legislature can write a new law that will pass First Amendment muster. Federal courts should not be writing state statutes. The Texas legislature needs to write a new law that merely prohibits public officials from making secret decisions, while permitting public officials to exercise the same First amendment freedoms held by all citizens.

### C.  *Overbreadth, Vagueness, & Excess Discretion Summary*

The Texas Open Meetings Act is both unconstitutionally vague and overbroad.  It cannot be enforced criminally against anyone until or unless a limiting construction has

been adopted by a court of authority in the state, usually the supreme court of a state. The State of Texas has adopted no such limiting construction for this Act, and the Attorney general's office continues to expand the scope of TOMA, through Open Meetings opinions. The legislature continues to amend the Act and expand its definitions to further restrict and chill the speech of those subject to the Act.

## V.
### TOMA IS NOT A VALID TIME, PLACE, AND MANNER RESTRICTION ON SPEECH

#### A. Time, Place, Manner Restrictions Cannot Be Based on Either the Content or the Subject Matter of Speech

Time, place, manner regulations must be "applicable to all speech irrespective of content." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975). Thus, time, place, manner restrictions "may not be based upon either the content or subject matter of speech." *Consolidated Edison Co. of New York v. Public Service Comm'n of New York*, 477 U.S. 530, 536 (1980).

TOMA's regulations limit the content of speech. TOMA prohibits the "deliberation" between government officials of the same governing body in any situation where proper notice has not been given to the public. *See* Tex. Gov't Code § 551.001, *et seq.* Deliberation is defined as "a *verbal exchange* during a meeting ..." and the exchange must concern "an issue within the jurisdiction of the governmental body." Tex. Gov't Code § 551.001 (2). A violation of TOMA is dependent on what speech a government official uses during a "meeting," and that speech falls under the subject matter of protected political speech. TOMA is regulating the political speech of government officials because issues in a governmental body's jurisdiction are most often political issues.

### B.  Time, Place, Manner Restrictions Require Alternative Channels for Communication

Valid time, place, manner restrictions require "alternative channels for communication." *Consolidated Edison Co. of New York v. Public Service Comm'n of New York*, 477 U.S. 530, 535 (1980). In the past, time, place, manner restrictions were upheld when groups of people attempted to express their views in a way that could be considered disruptive, and local governments were allowed to pass laws that regulated *when* and *where* this speech could occur, but the law could not eliminate the speech entirely. *See Cox v. New Hampshire*, 312 U.S. 569 (1941). *See also Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Linmark Associates v. Willingboro*, 431 U.S. 85 (1977); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976) (all cases limited speech irrespective of content and did not limit the speech of selected groups of individuals).

TOMA does not provide for a clear alternative channel of communication between elected members of a governing body and other members of that body, which effectively prevents communication between members and between members and the public. TOMA limits this speech by defining a meeting as a "gathering ... at which members receive information from, give information to, ask questions of or receive questions from any third person, including employees of the governing body about the public business over which the governing body has supervision or control." Tex. Gov't Code § 551.001(4)(B)(iv). TOMA seeks to muzzle all elected and appointed officials, preventing them from communicating about public issues with each other or the public except at a duly noticed meeting. That restriction is overbroad.

Thus, any time that governing officials are in each other's presence they may not talk about political issues under their control without facing possible criminal prosecution, unless they informed the public of their intent to do so days in advance. Phone calls, emails, letters and other types of communication are also capable of subjecting an official to prosecution, thus effectively chilling the speech of these members. Government officials cannot know what the content of an email will be prior to reading it or what a person will say on the phone prior to listening to him; if simply receiving email and listening to phone conversations about political matters could subject officials to prosecution, this is a very high risk profession indeed, and that is exactly the situation TOMA creates with its broad, sweeping language. Officials could be prosecuted if they attend a meeting (or read a letter, open an email, etc.) where another official discusses political matters, even if they had no idea those matters were to be discussed.

### C.  Time, Place, Manner Restrictions Summary

Government officials enjoy the same First Amendment rights as non-government officials. *Bond v. Floyd*, 385 U.S. 116 (1966). A time, place, manner restriction is not a valid way to limit the speech and assembly rights of a group of individuals. TOMA effectively chills the political speech of elected officials not allowing discussion among members or members and third parties of political issues. Time, place, manner restrictions cannot be based on the content of the speech, and officials are allowed to talk about non-political issues at will during these "meetings," but any mention by anyone of a political matter can mean a jail sentence for the officials. All political content, and discussion of public issues, has been banned for public officials, except at called meetings. The content of their speech has been singled out impermissibly.

**Plaintiffs' Brief in Support of Declaratory Judgment-23**

## VI.

### TOMA Acts as Prior Restraint on Speech

As noted above, TOMA singles out political content of speech among or to public officials in Texas, prohibiting such unless it is done at a duly noticed public meeting. In *New York Times Co. v United States, 403 U.S. 713 (1972) (Pentagon Papers case),* Justice Brennan noted that the First Amendment stands as an absolute bar to the imposition of judicial restraints, such as in that case, and that the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result.

This is what the Texas legislature has done—created a system of prior restraints upon the free speech rights of public officials, predicated upon surmise and conjecture that receiving information, other than at a public meeting, might result in something bad.

## VII

### Art. I, Sec. 8, Texas Constitution Affords Greater Protection to Free Speech than First Amendment; Prior Restraints, and Restraints on Content, Prohibited

Art. I, Sec. 8, TEX. CONST., states that "Every person shall be at liberty to speak, write, or publish his opinions on any subject…This fundamental liberty "shall remain forever inviolate". Art I, Sec 29. In the 1836 Declaration of Rights, re-incorporated as the Bill of Rights in 1845 and 1876, Texans chose protections in Art. I, Sec. 8 that are highly distinct from the First Amendment. Continued inclusion of an expansive freedom of expression clause and rejection of more narrow protections indicates a desire in Texas to ensure broad liberty of speech. *Davenport v Garcia, 834*

*S.W. 2d 4 (1992)(rehearing denied);* see *Sources of Liberty in the Texas Bill of Rights, 20*

*St. Mary's L.J. 1 (1988).*

The *Davenport* court noted, at 638, that:

> Consistent with this history [of the Texas Bill of Rights], we have
> recognized that in some aspects our free speech provision is broader than the First
> Amendment. *O'Quinn v State Bar of Texas, 763 S.W. 2d 397, 402 (TEX.
> 1988)*(noting that Texas' free speech right [has been characterized] as being
> broader than its federal equivalent," the Court concluded that "it is quite obvious
> that the Texas constitution's affirmative grant of free speech is more broadly
> worded than the first amendment"); *Channel 4, KGBT v Briggs, 759 S.W. 2d 939,
> 944 ((TEX. 1988)*(Gonzalez, concurring)(The state provision is more expansive
> than the United States Bill of Rights). *See also Casso v Brand, 776 S.W. 2d 551,
> 556 (Tex. 1989)*("our state free speech guarantee may be broader than the
> corresponding federal guarantee".)

> Under our broader guarantee, it has been and remains the preference of
> this court to sanction a speaker after, rather than before, the speech occurs. This
> comports with Article I, Section eight of the Texas Constitution, which both
> grants an affirmative right to "speak…on any subject", but also holds the speaker
> "responsible for the abuse of that privilege." The presumption in all cases under
> section eight is that pre-speech sanctions or "prior restraints" are unconstitutional.
> *Ex Parte Price, 741 S.W. 2d 366, 369 (Tex. 1987).*

TOMA acts as an impermissible prior restraint on free speech protected by Art. I,

Sec. 8, Texas Constitution. It says that a certain class of persons—public officials, are

prohibited from communicating any speech about public matters, among each other, or

their constituents, except at a duly noticed meeting. Communications at all other times

and places are prohibited. Such is a prior restraint, in violation of the Texas Bill of

Rights. See *Texas Mutual Insurance Co. v Surety Bank, 156 S.W. 3d 125 (Tex. App. Ft.*

*Worth, 2005):*

Simply put, it is generally unconstitutional for courts to require one to acquire permission to speak before speaking: It has never been the theory of free institutions that the citizen could say only what courts or legislatures might license him to say, or that his sentiments on any subject or concerning any person should be supervised before he could utter them. Nothing could be more odious, more violative or destructive of freedom, than a system of only licensed speech or licensed printing.   [quoting] *Ex Parte Tucker, 220 S.W. 75, 76* (Tex. 1920).

Prior restraints on speech are presumptively unconstitutional. *Davenport v Garcia, supra; San Antonio Express News v Roman, 861 S.W. 2d 265, 267 (Tex. App.- San Antonio, 1993).*

In TOMA, the Texas legislature has crafted a perfect system of prior restraint— public officials can speak to each other about public matters anytime, and go to jail, or have their free speech restrained, so they can only talk at a noticed meeting. Such violates the Texas constitution.

### Prayer

Wherefore, premises considered, Plaintiffs respectfully request that the Court grant an evidentiary hearing on this matter, and thereafter declare TOMA unconstitutional on its face, and as applied, and restrain the defendants from enforcing this act against plaintiffs, and all other public officials in Texas.

Respectfully Submitted,


DEGUERIN DICKSON & HENNESSY


**Dick DeGuerin**
1018 Preston Ave., 7th Floor
Houston, Texas 77002
Telephone:   713-223-5959
Facsimile:   713-223-9231
State Bar Card No. 05638000


ROD PONTON


**Rod Ponton**
2301 North Hwy 118
P.O. Box 9760
Alpine, Texas 79831
Telephone:   432-837-0990
Facsimile:   432-837-0971
State Bar Card No. 16115170


ATTORNEYS FOR PLAINTIFFS


Certificate of Service

I hereby certify that I caused the foregoing Plaintiff's Brief in Support of
Plaintiff's Original Complaint, to be served upon Defendants in accordance with the
Federal Rules of Civil Procedure, and delivered a copy of same to defendants via
overnight delivery, on this the ___ day of _____, 2005.


**Plaintiffs' Brief in Support of Declaratory Judgment-27**